Thank you, Your Honor. May it please the Court, Patrick Philbin for Appellant Aldini, AG. I'd like to reserve three minutes of my time to rebuttal. Your Honors, I realize this case may seem very complicated with a lot of parties and involving French judgments, but it boils down to a fairly simple story and a handful of clear legal errors that the District Court made in dismissing the case. The complaint here alleges a transnational plot to strip Dolphin Integration of its assets that involved MBD and Soitec reaching out from France to Silvaco in California, convincing it to stay out of the bidding so that the Bankruptcy Court in France wouldn't know that there were other bidders. That ensured there was no public auction, allowed MBD and Soitec to buy all the assets for Dolphin Integration in a pre-packed sale for just a bargain basement price, and then as the quid pro quo, sell some of those assets back to Silvaco in California. That enabled them to get all the assets for 200,000 euro, even though when they announced about a month later what they had acquired, market valuation of Soitec popped in a way that suggested a valuation for those assets of 250 million euro. So Aldini came to the District Court in California seeking relief because Aldini was squeezed out with nothing. And I'd like to focus on four errors the District Court made in dismissing. First, on issue preclusion, second, on the intentional interference claim, the dismissal for failure to state a claim, third, personal jurisdiction on MBD and Soitec, and lastly, very briefly, I'd like to touch on sovereign immunity. So on issue preclusion, Your Honor, the fundamental point here is that there are two distinct wrongful acts that underpin the intentional interference claim that were never litigated actually and addressed on the merits in France. There was no ruling in France on them. The first is what I will call the Silvaco scheme. That is reaching out to Silvaco in California, getting it not to bid so that there could be this pre-packed sale, then selling back assets to Silvaco in California. Can you just step back a minute and give me a category of what you're arguing now? Are you arguing jurisdiction? Are you arguing cause of action? Issue preclusion, Your Honor. Issue preclusion. There are two wrongful acts underpinning— Even if we agree with you that there's no issue preclusion, you still have to state a claim, though. And I don't understand why this intentional interference claim states a claim given how speculative it is that you would have won this auction. Well, Your Honor, I think there are many cases, as cited in our brief, that hold that where there is an auction in a commercial setting, that is—and there is someone who can show that they had a reasonable prospect of success, not that they would succeed, but that they would have a prospect of success, that they were in the running to bid. If there is something fraudulent that derails that auction scenario, that is sufficient to state an intentional interference claim under California law. Often there's some existing relationship, though. Can you point to a case where there's—where just speculation that you would have bid is enough? Well, yes, Your Honor. And it's not speculation that we would have bid. Okay, well, you could say you would have bid, but speculation that you would have been the only bidder? How do we have any idea that you would have won this auction? The Sierra National Insurance case, Your Honor, from the Central District of California, which involved a company in receivership and— Any appellate binding authority. It is not an appellate binding authority on you, Your Honor, but it is an application of the common law of California on what constitutes a claim for intentional interference. And the court there held that when there was a bidding process for the company in receivership, and the winning bidder—interestingly, it was a coalition of French companies there—the winning bidder there had misrepresented something to the conservator, and that allowed them to win the bid. And the losing bidder came and complained. But that's the difference. There was an auctioner and there was a bidder. That's true, Your Honor. And there was a losing bidder who actually made a bid, and therefore it was possible to tell what would have happened if the first bid hadn't been accepted, because there was a second bid and we know what it would have been, and he did have a relationship with the situation. Here, there was no auction, there was no bid. And the Brosnan v. Florida case cited in our brief, Your Honor, also involves a situation where there was no bid because the interference actually prevented the plaintiff there from bidding on the auction. And in that case, the court said, if you come in, there's going to be a process. We know there's going to be a process under French law. We know that under French law, that the bankruptcy trustee is supposed to maximize value and get the best—and that there would have to be a public auction if there are multiple people interested in it. And we know that that process was whole derailed. If there is some derailure of a process that is supposed to take place under law, Brosnan v. Florida says that in itself can be the cause of action for intentional— My case, is this a district court case? It is a district court case. What's the name of it? Brosnan v. Florida. Are there any California appellate cases on this point or anything like that? Well, Your Honor, the cases that involve auctions in California would be the Sierra National Insurance case— That's a federal case, too. But it's applying state law. No, I get it. I'm just curious whether there's like a California Court of Appeal case or anything like that on this particular point. Only ones that I believe are an apposite. The ones that are cited all involve—the other side sites, the district court cited, they involve horse race, licensing for a poker club, or what the court itself called a unique scenario for a public works contract where the contracting entity could decide to deny all bids. So in terms of auction, it's this Brosnan case and the Sierra National case? And the A-Tech Mechanical case, Your Honor, and the San Jose Construction case. And those are just the cases in California. Now remember, this is a common law claim, and there is a thread throughout the common law across the country that allows claims like this, and there are multiple cases cited in our brief from the Eighth Circuit, from the Supreme Court of New Jersey, from Kentucky, and they all recognize, and this is what the way the Eighth Circuit described it, is this is in the American Business Integrity v. Hayworth case. That court said that the prospect of winning a bid may constitute a reasonable expectancy of commercial relations supporting a tortious interference claim where circumstances suggest that the plaintiff could successfully compete. And the circumstances here suggest that Aldini could successfully complete. It's a multi-billion dollar Swiss bank. What they do is they identify targets, they establish a position in them, and then they look for the opportunity to acquire the company because they do research and figure out what company is undervalued. They thought that Dolphin Integration was grossly undervalued here. They established a strategic position in it, and their goal was, they had been researching it for years, to then look for an opportunity to take over. Did they allege what their bid would have been? I don't know exactly what their bid would have been. Did they allege what the amount would have been? They have not alleged what they would have bid, but they have alleged that they assessed the value of Dolphin Integration to be, I believe, 649 million euro. So they knew, their research suggested that it was a vastly undervalued company and that those assets, because remember, what this is all about is IP assets. It's about silicon on insulator technology. And that's why, when Soytec and MBDA got this for 200,000 euro, all of a sudden, Soytec's value popped by 150 million euro. And that suggests a valuation for Dolphin of 250 million euro. They were able to turn around and sell just a fraction of the assets that they got for 200,000 euro for over 1.1 million euro to Slovakia. So Your Honor, the case is in the brief established throughout the common law that where there is a competitive bidding scenario in a commercial context, and you have a party that can show that it would have been in the running in that competition, but there was some wrongful interference in the bidding process, which is exactly what's alleged here, that states a claim for intentional interference. You're going to run out of time, and there are a lot of other issues. Can I ask you about forum non-convenience, which I think was not on your list, but I'd like to know about the management torts and forum non-convenience. So did you ever raise the management torts in France? Not in the way that they're framed here, no. Why not? I don't know the answer to that. I mean, that would have been a strategic call for the French Council long before I was involved in the case. I think, Your Honor, here that the management torts, it became clearer after some time the way that that claim could be formulated here in the Northern District. And why is this a better forum for management torts that are under French tort law than France? Against French defendants. Against French defendants. Because Your Honor, as we explained in the supplemental brief, for forum non-convenience to apply, there has to be an adequate alternative forum. Here, France wouldn't be an adequate alternative forum at this point because the statute of  You just said that you made a strategic decision not to assert the, that's the word you used, not to assert the claims in France. So how do you get out? Your Honor, let me, I perhaps misspoke because I don't know what the decision made in France was. I don't know exactly what the decision was. But is there any, I mean, whatever the decision was, it was a decision. It could have been brought in France. Well, Your Honor, it perhaps could have been brought in France, but the, at the time that the third party opposition was filed in, in 2018, Aldini had very limited available information about exactly what had gone on. It was only until 20, it was in 2020 that they discovered the sale to Sovacco. So is that because of discovery that happened in this litigation? What changed? It, because the, the sale to Sovacco didn't, wasn't arranged until sometime in the summer of 2020. There was first, they had to seek special permission from the bankruptcy court to be able to sell any of the assets because they were under a two-year embargo. But was the litigation in France all done as of 2020 when you learned about the sale to Sovacco? No, it was still ongoing. Well, exactly. So what? It gets back to Judge Friedland's question then. So why did you go back there and file the management tort claim there then? Well, Your Honor, because at that point it was all on appeals and there had been a set number of claims that were presented in the third party opposition. And there, the focus at that point, remember, the tort claim is distinct from the third party opposition. The focus of the litigation in France was not tort damages, it was to try to undo the  So it's one specific cause of action to try to undo the sale. That was the focus of the litigation in France. It was only after that had pended for some years and there had been the loss all the way up through the French Supreme Court that Aldini turned and then also learned about Sovacco. They didn't know about that until November 2020. But even in France, he kept filing new cases after that. Not new cases, Your Honor. There were discovery cases that were ongoing during that time, but there was not a new case. Everything in France... He was getting fined for repetitious litigation and so on. But no, Your Honor, everything in France stemmed from the third party opposition. It started with the attempt to undo the... But it didn't have to. I mean, you could have brought this claim in France. Had they known sufficient about it, but I don't know exactly what was known to Aldini at the time. But Your Honor, the point is, at this point, the claim was brought with the intentional interference claim in the Northern District. Now, as long as the intentional interference claim survives, which I believe it should, then form nonconvenience for the French management tort claims would make no sense because it would be splitting up the case. Okay, well, what if we disagree with you that the intentional interference survives? Then what should happen with these management torts? Well, the management tort claims, again, Your Honor, because the statute of limitations has run in France, that is not an adequate form. But I don't... I mean, first of all, I don't understand the basic principle that form nonconvenience doesn't apply if the limitations has run. Because again, it's the plaintiff who let it run. So it seems very strange to say, well, you had a forum and you could have used it, but you didn't. So therefore, you now get a prize for that. But in this instance, even more so, since the case wasn't even over in France entirely, it doesn't seem to make a whole lot of sense. Well, Your Honor, the cases say in the Corrijos case and the other case we cited in our supplemental brief that it is an inadequate alternative forum. Well, I understand they say it, but I'd like to know why and what the limitations of that are because... Well, go ahead. The limitation on that, and this is in the case law, is only if there has been a deliberate choice to try to run out the statute of limitations in one forum in order to then seek another forum and say, oh, sorry, we can't go. Why didn't that happen here when you could have brought the case there? Because there is no evidence to suggest that there was some strategic calculation to run out the statute of limitations. Aldini obviously was litigating what it thought was the best avenue for litigation in France, which was the third-party opposition. That was a focus on trying to undo the transaction. It wasn't going very well, though. So why not file this new thing, this management tort thing there? Because I believe, Your Honor, that the focus shifting to a tort claim only became feasible after Silvaco's involvement became known, which shifted the complexion of the case to potentially a broader scheme. And then after the French Court of Cassation rendered its opinion, that was until May of 2021. So then you're talking between May and August is when... Between the preclusion issues and the forum nonconvenience issues and limitations period. Because the preclusion, you say, well, this wasn't litigated in France. But if it could have been litigated in France, but for the limitations period, then it would seem that you are, again, you're getting a prize for not having brought a claim that if you'd brought it, it would have been issue precluded here, would have been issued preclusion here if you lost. And that would have shown, which seems pretty obvious, that France was an adequate forum for that claim. Your Honor, that starts to sound like claim preclusion, like we'd be precluded. Well, that's what I'm saying. It's a interaction between the forum nonconvenience question and a preclusion question in the sense that you could have brought the claim. Yes, it may be a claim preclusion kind of thing, but it's not resting on that. It's resting on a forum nonconvenience notion that you could have brought this, you didn't bring it. The fact that the limitations period has now run should not undermine the fact that you had a forum, you didn't use it. Do you know the Ranzi cases? I think they were cited in some of the briefs. The Ranzi cases? R-N-Z-A. They were cited by the other side. And essentially what happened, and I was on the panel, which was why I didn't have a second one. But what happened is the first panel there and then the second one following said, well, there was in France, no, it was in the Netherlands, an adequate forum, true, it's over now, the litigation is over, but the fact that the litigation is over doesn't give you the right to ignore the fact that you could have done it there, but you didn't do it there. So I'm kind of baffled by why a forum nonconvenience should award a non-assertive approach to your French litigation. Because, Your Honor, according to the cases, the fact that a statute of limitations has run usually means that there's not an adequate alternative forum. It's in the Correios case. I know, but in any of those cases, had there already been a case in the other forum? It was always the situation that the case could have been brought. I know, but in any of those cases, was there already a case that was brought there? I'm not sure that there was, Your Honor. Yeah, that's the difference. But this, again, was a very different type of litigation in France. We're talking about not a tort action, not something like that, a very specific type of action directly to overturn the bankruptcy court decision to unwind the transaction. It's the difference between trying to undo a transaction to get the assets and a tort action. And the fact that Aldini was... Is your assertion that this claim could not have been added to that litigation? I don't know for sure, Your Honor, what the French law would be, but my impression is that what was available in the Commercial Court of Grenoble in France was this third-party opposition to undo the litigation, to undo the sale. You started off talking about, trying to talk about preclusion, you said there were two distinct wrongful acts. I got down the first one, getting Silvaco not to bid. What's the second one? The second, yes, the second one, Your Honor, is the use of insider information. Now, the use of insider information... You're saying that one of them may be precluded, but the other's not? Is that basically where this is going? No, Your Honor, neither of them is precluded, neither of them. Because none of that was involved in the French litigation, is what you're saying? Well, let me be clear about that. The French litigation did not involve the claims about Silvaco, because the litigation started in 2018. But Silvaco wasn't there yet, basically. Right. And does anybody know? El Dini didn't know anything about Silvaco until 2020. Now, in their brief on forum non-convenience, the supplemental brief that was supposed to focus on forum non-convenience, the MBD-SOTEC parties included sort of a sur-repli and issue preclusion, where they say, for the first time, that the second French appeals judgment actually addressed Silvaco, and somehow that created preclusion. Now, we'd like an opportunity to reply to that, if the court is going to focus on it. But the answer is, it wasn't addressed on the merits and ruled upon as a factual matter. What the second appeals judgment in France was, was an attempt to reopen the first appeals judgment. And it's an attempt to go back and reopen just that judgment, which can only be done on very limited grounds, under Article 595 of the French Code of Civil Procedure. And so it's like an attempt to reopen an appellate court judgment. And yes, there was a reference in that attempt to reopen the judgment to the fact that the assets were sold to Silvaco. But the court, it was an appellate court. It was not receiving facts and ruling on facts and saying, this didn't happen or this is not fraud. What it said was, that's not enough under Article 595 to reopen the judgment. So that Silvaco scheme has never been addressed and ruled upon on the facts in a court in France. The second ground that has never been ruled upon on the facts is the assertion that there was a use of insider information. Because MBDA and Soitec each had a person on the board of Dolphin Integration, and the allegations that they provided insider information to allow the prepack offer to be done. Now, that claim was raised in France in the third party opposition, in the sense that Aldini argued that there had been a violation of the rules governing stock market listed companies in France, because of the use of insider information. The court in France didn't rule on that on the merits. This is page 899 of the excerpts of record. At 899 of the excerpts of record, what the French court said was, the bankruptcy court had no obligation to look at those rules and enforce those rules. So there is no ruling that the use of insider information did not happen. There's just a ruling that in the context of that particular action to unwind the bankruptcy sale, the bankruptcy court didn't have to look at those rules prohibiting the use of insider information. So both of those wrongful grounds of interference never were ruled upon in France. Putting that to one side, there is also this separate ground for issue preclusion that the French Supreme Court ruled on Aldini's case only on timeliness grounds. Now, I'm not going to get into all of the details of the back and forth of that, because there's a simple way to cut right to the chase on this. There are seven different expert opinions arguing back and forth about what that French Supreme Court decision means, because it was issued without any opinion. And the one thing that can be said for certain at this point is that it's not entirely clear here exactly what the French Supreme Court holding means. And this is the principle. So when it's not clear what the judgment that's supposed to be preclusive means, how's it supposed to get decided? It gets decided. The jury doesn't decide it, right? Sorry? The jury's not going to decide it. No, no, Your Honor. Issue preclusion cannot apply as a matter of law. And this is the principle. So the idea is if it's unclear, then preclusion's out the door. Exactly. And this was the principle, Judge Cannella, you applied just earlier this year in Vernon v. McGlone. I'm just a district judge. I don't count. Well, Your Honor, but it's the same principle of law, and it was a similar case. What was the case? Vernon v. McGlone. Oh, okay. Yeah, right. Vernon v. McGlone, which a similar case in the sense that there was an appeal there, and the appellate court rendered a decision without opinion. And as you pointed out in the opinion, Judge Cannella, that made it difficult to figure out exactly what had been ruled upon and litigated in that appeal. And because it's always the defendant who bears the burden of proving exactly what was litigated and decided, that was sufficient for issue preclusion not to apply. And the principle, as you pointed out, is the issue preclusion doctrine does not apply if there is any uncertainty about whether the issue was actually or necessarily decided by the court in the prior proceeding. Now that was under Illinois law, but the principle is the same under federal principles of issue preclusion. We cite the Love v. Villicana case for that and other cases in our brief. So that separate problem, that the French Supreme Court decision, it doesn't matter. Everything that was decided below, different issues in that, because it went up on appeal and there was one ground that was timeliness, and it appears that the French Supreme Court ruled only on timeliness, that wipes out the preclusive effect of everything else under American preclusion law. And how do we know American preclusion law applies instead of French preclusion law? Because it is always the foreign court that applies its principles of preclusion to other judgments, Your Honor. I mean, that's clear. Except sometimes, their principles of preclusion may be to apply the French principles of preclusion. I mean, that's what happens between federal court and state courts, for example. Yes, for courts in the United States, but for foreign judgments, it is federal preclusion law that would apply, federal preclusion principles, when the case is in this court on the ground of federal question jurisdiction, which it was in this case. So... Is it? I thought it was... Is it federal question jurisdiction, or is it some sort of diversity jurisdiction? It was the Defend Trade Secrets Act claim, I believe, Your Honor. It was not the... Because there is not a ground of diversity where you have a foreign entity on each side of the case. Oh, right. So, that's why issue preclusion can't apply, Your Honor. And the district court plainly got this wrong, because the district court was focused on the claim in France under Article 642-3 of the French Commercial Code, which is completely irrelevant to Aldini's intentional interference claims in this case. It's not... It doesn't form a part of any of the wrongful interference that Aldini has claimed. Let's issue preclusion.  I think we've taken you way over your time. I think I need to stop you, unless anyone has other questions right now. Okay. Thank you, Your Honor. We'll still give you three minutes for rebuttal, but let's hear from the other side. Good morning. Denis Chameleau, Foley-Hoag, for the Republic of France, the Sovereign Defendants, and Mr. Camara. I will argue on immunity. Under the third clause of the commercial activity exception, Aldini was required to plausibly plead an act outside of the United States, commercial activity outside of the United States, and direct effect in the United States. Aldini did not plead an act, did not plead commercial activity, did not plead direct effect. Aldini keeps changing the formulation of its claim, which is not appropriate in appeal, and the new formulation should fail like the original one. So, first, the act. The United States Supreme Court said in Saxe II that the act has to be the gravamen of the lawsuit, the core of the lawsuit. The act that is alleged here, the recruitment outside of the United States of California-based accomplices, is not the gravamen of the lawsuit. That's the act that was presented to the district court. That's the act that was presented in the initial brief here at page 49. The gravamen of the lawsuit, as the district court found, is the prepack sale in 2018. In the reply brief, Aldini tries to change things, present a new formulation. Now there are multiple acts, and this conclusory word of interference that is being used. But the only specific act that is described on page 20 of their reply brief is the recruitment of California-based accomplices, and Aldini says very clearly that that's one element of their claim. Under the Supreme Court decision in Saxe II, one element is not enough. Even a necessary element is not enough. They had to plead an act that is the core of the claim. That's the act. Now, on commercial activity, what was presented to the district court was the purchase and sale of Dolphin Integrations assets while excluding other bidders. That was the commercial activity. The district court rejected it. Now there's a new formulation. It's one, the alleged control over the bankruptcy trustee in France, and second, it's the control over the co-defendants, allegedly directing them to interfere with the judicial process in France. So as to the first thing, it is not appropriate for Aldini in a reply brief on appeal to address for the first time a ruling that the district court made on control over the trustee. And Aldini is wrong because the complaint says very clearly the trustee is appointed by the Republic of France. It exercised its powers as part of the Republic of France, and Aldini even in the complaint refers to the powers of the trustee as a taking. They cannot now mention commercial activity. And as to the co-defendants, the district court was very clear that there cannot be because Aldini has consistently failed to plead an agency relationship, which it was required to do, facts showing the right to control the co-defendants, facts showing that the co-defendants had the right to act on behalf of the Republic of France, not a single fact in the complaint. And the use of the word conspiracy is not an excuse for failing to plead an agency relationship. With respect to direct effect, we pointed out in our brief that the direct effect that's alleged in the complaint at paragraph 438 is not the direct effect that is argued in the briefs. And the direct effect that's pleaded in the complaint required a number of intervening events, including decisions of the French courts and finding customers in the United States. Under this court's decision in Tarankin, what they alleged as direct effect, either below or more recently here, is not sufficient. I'd like to say one word about Mr. Camara. The Republic of France is the real party in interest with respect to the claims against Mr. Camara. Aldini makes very clear that whatever he did was in his official capacity, that he was the prime person or the point of contact for France. This is in the complaint. We pointed this out, and it's not rebutted on appeal. It's a concession. The claims against Mr. Camara should be dismissed based on common law, foreign immunity, and some courts have even ruled that the FSIA applies when the individual is acting, is alleged to have acted in his official capacity. And the claim is really the sovereign is the real party in interest. There's not a single fact pleaded regarding Mr. Camara, not a single fact in the complaint. This is a claim against him, an individual, for allegedly taking government action in France. Exercising jurisdiction over him would be unreasonable, and it would be a violation of due process, and it would also make it possible to just evade the FSIA because you could just plead. To be specific, what governmental action do you think is the core of this complaint? What's the governmental action? I mean, you're saying it's not commercial action. It's regulatory or governmental action. What is the regulatory or governmental action? What's alleged in the complaint is that the president of France and the former president of France and the former prime minister and a number of cabinet ministers and generals exercise the power of the state – that's the word in the complaint – and the weight of the republic – these are the words in the complaint – to impose some pressure and control a trustee to advocate in favor of two companies in the marketplace. That cannot be commercial activity. The source of the power of the president of France is the power of the republic. And when government officials promote, support the activities of companies in the marketplace, that's what, for instance, the Second Circuit in Cato ruled is quintessentially a governmental function. You're over your time. Thank you very much.  Thank you, Your Honor, and may it please the Court. Alex Loomis from Quinn Emanuel on behalf of the MBDA Soytec Defendants. Now, I was surprised when Mr. Philbin opened by saying that this is a simple case that ultimately boils down to people coming to California and recruiting Silvaco Incorporated into a vast transnational scheme. And the reason I was surprised is because if you look at the argument section for their opening brief, that is not cited as a relevant point when discussing their IEPA claims, issue preclusion, or personal jurisdiction. They mention that only briefly in the FSIA section and in the background section of their brief. But it is, at best, a minor part of the complaint, and the California aspect of it, that this all happened in California, was not even pleaded until the second amended complaint after all the MBDA Soytec Defendants and Mr. Depayreau were dismissed with prejudice. This is just one example of them being a moving target, whether it's them presenting for the very first time in the reply brief, not in their three briefs below or in their opening brief, the reasons why they think there are specific issues that are not precluded, which I will get to, or all of these issues that we've had in France where the French courts have repeatedly sanctioned them for vexatious conduct. Given all of this history, I think that this court's instinct to dismiss, or potential instinct to dismiss, on forum non-convenience grounds is a good one. I want to start with RANSA v. Nike because, as Judge Berzon pointed out, that is cited in our briefs, and we make the very point that Judge Berzon was making. In RANSA 1, this court, in a precedential opinion, held that it did not matter if a case, the fact that people had already litigated before the Dutch tribunal, not even a court, just a tribunal, governmental commission, fair and equal employment opportunity claims, was sufficient to establish that they had an adequate alternative forum. And then this court reaffirmed that holding just a couple years ago in RANSA 2, the panel in which Judge Berzon was a panelist. Now, Mr. Philbin simply does not have an answer to that case. That alone is sufficient to dismiss the management towards claims, and I would wager that- Well, but there's the statute of limitations problem. So he says the forum is no longer adequate because of the statute of limitations. If you were not going to assert the statute of limitations, we could dismiss this whole thing. Are you going to assert the statute of limitations in France, though? So I'm not prepared to waive that at this time, Your Honor, but just two points. So in RANSA v. Nike, the court said very clearly, and even more explicitly in RANSA 2, that you don't need to prove that there is a future prospective forum, just that there was at one point a prospective forum if you did litigate there. So the statute of limitations issue is neither here nor there. So I can't remember whether that's the case, though, that has this language about intentionally running out the statute of limitations. No, Your Honor, that's a different case, and this is a different doctrine. So the fact that they've already litigated fully in France is an independent reason, independent of the statute of limitations. By the time they sued, by the time RANSA 2 came around in 2023, it was some 13 years after the litigation in the Netherlands. At that point, what they were trying to do was have a 60B motion, and there was a question of whether they had unduly delayed, as I understand it. That's true. But that's connected to a limitations period, and whether it was too late for them to do this. And the response was, well, you knew all the way back then that you had an adequate forum, and you should have been in the adequate forum then. That's precisely right, Your Honor. And so I think that's sufficient grounds for that. But on the limitations period, too, I would point out the point that we make, I think, on page 6 of our supplemental brief. There is actually quite a bit of evidence that they intentionally ran down the statute of limitations. They waited to serve the U.S. complaint literally the day before the statute of limitations expired. And I was surprised to hear Mr. Philbin say that they didn't know any of the relevant facts to bring their claims until 2020, given that they admitted below, and this was in the supplemental, supplemental excerpts of record that I submitted, they said below that actually they had sufficient notice as of August 27, 2018, to start bringing these claims. This whole thing about we didn't know about the facts until the SILVACO allegations came out is entirely irrelevant because the SILVACO allegations have nothing to do with the management towards claim. Where in the supplemental record is that? It's the supplemental, supplemental excerpts of record that I submitted with the supplemental brief. And there's only about one page there, so you'll find it quickly. But just to pause there, that this has nothing to do with the SILVACO allegations. That's also another reason to dismiss the management towards claim because they've collapsed in the reply brief on this conspiracy with SILVACO Incorporated, notwithstanding that when they were litigating in France simultaneously with their U.S. complaint, they were saying the sale actually went to SILVACO France, illustrating that this is just naked forum shopping and above all else. They've never explained how they were telling the Court of Appeals in France that it was SILVACO France and telling the U.S. court here that it was SILVACO Incorporated. They were making those contradictory assertions in two different forums at once. But set that aside, they've never explained how the SILVACO France allegations connected all to their management towards claims. Their management towards claims involve a conspiracy to drive a company to the ground. Those allegations are fanciful. They're completely conclusive and implausible. Everything's on information and belief. There's no specifics as to what financing opportunities were turned up and so forth. But even setting all that aside, they allege that SILVACO didn't enter this conspiracy until the middle of the bankruptcy proceedings, at which point all of those torts would have been completed. We make that point in our brief. They don't respond to it at all. It also was part of the court's ruling that they didn't have specific jurisdiction over that claim. So just so I can try to track this, you're saying under Ronza that we don't even need some sort of intentional decision to run out the clock, but you're also saying we have enough evidence in this record that we could ourselves find that or do we need the district court to find that? How could we say that there was this intentional decision to run out the clock? Could we just do that ourselves? I think you could do it yourselves because Ronza found forum nonconvenience when the district court didn't. They didn't make the finding that there was the running out the clock in Ronza, but there's no reason why— But I thought you were saying—I'm going to have to read the details of Ronza again, but it seems like you're saying Ronza doesn't even require an intentional running out of the clock as long as there was some French proceeding. That's true, yes. Those are two independent reasons. In Ronza, was the French proceeding—because I think one of the weirdnesses here is that they didn't bring— I mean, this is how we have the problem. They didn't bring the management torts in France. In Ronza, had they brought some equivalent claim in the other forum? It was somewhat equivalent but not quite. It was a claim—they were requesting a finding from a Dutch commission that there had been discrimination, and then they could have taken that commission finding to a court and potentially sought damages. But the claim there that they were trying to do in the U.S. was discrimination, the same kind of thing. Yeah, it was—that's right. I'm sorry, Judge Berzon. Yeah, go ahead. Yeah, it was—that's right. They actually would have sought damages in the U.S., and they said that the remedies were different for that reason, and they said that mattered. But also I would point— But here we have the weirdness, I guess, a slight difference. Maybe it doesn't matter as a difference, but here we have them asserting management torts that they never asserted in any forum in France. Oh, that's true. But to be clear, they told the U.S. court below in the 1782 proceeding, which they filed before the complaint, that they were actually intending to file their French management torts in France. We've noted this in our Peli brief, to be clear. There's no explanation for why they decided to drop it. I mean, the obvious explanation is because they kept getting sanctioned and because the rulings in France actually are preclusive on these issues. And I can turn to that now, but briefly on the speculative nature of the AIPA claim as well. First, I agree with fully all of the questions that this court was posing, but I also want to push back on an unstated assumption of Mr. Philbin's argument, that there was going to be a public auction if another bidder showed up. To be clear, there was another bidder who showed up to the prepack offer. It wasn't Aldini. The prepack hearing was a public hearing that they could have attended, and other people did attend, including people with contracts with Aldini. This is all in the bankruptcy judgment, which lists all of these parties being in attendance. Oh, you mean people with contracts with Aldini? Yes, but also a shareholder, Mr. Gervier, did show up and said that he wanted to delay the proceedings so he could assemble another bid. And the court didn't say that, oh, well, if there's another bid, then I have to go to public bankruptcy proceedings because that's not true. After this argument, if you look at pages 729 to 730 of the fourth volume of the excerpts of record, there is an uncontradicted declaration below by a French bankruptcy law expert, that explains that the reasons why a French bankruptcy court would go to a public auction would be if they determined that the price was unreasonable, not the existence of other bidders. And here what the bankruptcy court said, yes, the price was lower than I wanted it to be. However, under the circumstances, I feel compelled to sell this right away rather than proceed to a public auction. The reasons were this was a company that was facing imminent failure. There were contracts that were going to be unfulfilled. There were 150 employees who would have been immediately unemployed. This was a major company that required immediate saving to keep operations going. That's why the French bankruptcy court elected not to have a public bidding process. The other reason, which is also in the Jean Tan Declaration, I think pages 732 to 734, is that even if they had submitted a bid, there's no guarantee that they would have been allowed to purchase intellectual property, which according to their complaint is vital to national security products, including missile technologies that MBDA wanted to employ. Because like in the U.S., France has a procedure to allow foreign companies from taking over important national security technology. And I'm pointing this out to be clear. This is all actually in the district court's ruling on page 1ER58. The district court ruled that their allegations that they would have been able to purchase this IP was speculative for purposes of the management torts claim, but also for purposes of the IEPA claim, I would argue, because there's no evidence that there would have been an auction, and two, there's no evidence that they would have been allowed to win the auction. And notably, the first TRECO declaration. Sorry, sorry. There's so many issues here. You're arguing this now as a way that we could affirm on other grounds on the merits of the management torts? Is this what you're trying to get us to do right now? Sorry, no. It's the management torts, but it's also the IEPA claim. Let's assume the IEPA claim is no good. That's great from my perspective. Are you trying to say something about the management torts? Well, I'm happy to say more about the management torts. You just were talking about the management torts for a moment there and saying something about the district court's findings. And I'm trying to figure out, are you asking for an alternative ground of how to deal with the other? Because personally, I'm having the most trouble with the management torts. That's why we're asking about forum nonconvenience. But maybe you're suggesting something else, or no? I have an alternative grounds for the management torts claims, which is spelled out in the appellee brief, which they don't respond to. The alternative ground is this. There were only two different theories of damages that they claimed, that they said would give rise to their management torts claim. The two theories of damages that the court said they could theoretically be allowed to pursue are reputational harm suffered by Aldini and the harm of them incurring expenses in their acquisition efforts. There are no allegations of reputational harm in the complaint that are anywhere, let alone plausible or conclusory. I just don't even know what they are. There are no allegations of what they spent money doing and how they lost money in their investment efforts either. Again, not even... This is the speculation about the auction. We have no idea if they would have won it because they think they lost the money of the different value. That's actually not even an alternative ground. That actually was the district court's ruling and they didn't appeal that. But the management... Wait, no. That wasn't what the district court did with the management torts. It is partly, yes, Your Honor. So there were four original theories of harm and one of the theories of harm for their management torts claim that they asserted is that the management torts prevented them from bidding on the IP. And this is on page 1ER58 of the excerpts of record, the first motion to dismiss order. The court said there's no guarantee there would have been an auction and there's no guarantee you would have been allowed to win the auction. And the first TRECO declaration, which they submitted, didn't actually say that he was... He said he wasn't sure if they would have been allowed to win the auction assuming that it actually happened. And that was part of the district court's ruling for the management torts claim and they didn't challenge that in their opening brief or in their reply brief or in their supplemental brief for that matter or in their opening argument just now. There... I thought the district court thought that the management torts were precluded. Well, he did. Just to be clear, so to be clear, yes, he did. There were other species of harm that he said they could sue on for the management torts claim. But my argument that we make in the supplemental, excuse me, the appellee brief, is those other theories of harm, reputational harm, and lost investment effort are also implausible and conclusory and that's an alternative basis to affirm the decision below. On the merits of the failure to state a claim.  Yes, I can get to issue preclusion because I think it's... If you'll excuse me, I know that I'm over my time, but I want to be very clear here on a few things. This is... We did not get an explanation as to what arguments they thought they were raising here that were not litigated in France until the reply brief. The argument that we made, and this is on page 23 of the appellee brief, not made for the first time in our supplemental brief, as Mr. Philbin suggested, is that the second appeals judgment, which was filed after November 2020, when the Sovacos deal was publicly announced, the entire point of the second appeals judgment was whether or not the Sovacos transaction afterwards is evidence that there was collusion from the beginning and an effort to suppress bids. Now, Mr. Philbin said that wasn't a ruling on the merits. They were just saying you can't submit new evidence, that this is a final decision. I would direct this Court's attention to 4ER780, where the second highlight on the page says the fact that a few months before the prohibition on transferring the assets in question came to an end, a request was filed so that a transfer could be made to the company Sovaco France is not sufficient to establish a collusion that would have been established two years earlier with a view to finally allocating these assets to this company and to allow a capital gain for the benefit of the transfer. It is not established that there was a collusion. That is a merits holding. It is not a holding that we refuse to consider new evidence. It says, plain as day, there was no collusion. Now, the other thing that he says is this claim that there were no insider information allegations. I would direct this Court to pages 8 to 9 of my supplemental brief. The allegation that there was insider information dealing was made before the first appeals judgment and was rejected by the first appeals judgment in the passages that I cited on page 8 of the supplemental brief. The final point that they raise, and this argument is hard to grasp where to even begin with this point. They claim that the Court of Cassation affirmed the first appeals judgment on only timeliness grounds and did not address any of the merits grounds decisions. The second appeals judgment rejects that reading. The second appeals judgment says on pages 779 and 780 that the Court of Cassation dismissed all grants of cassation and that that rendered final the assessment made by the Court of Cassation on the absence of any fraud. Now, Mr. Philbin has appealed to Res Ducati principles. This principle that's most relevant here is the last-in-time principle. A later-in-time judgment is preclusive as to the meaning of an earlier-in-time judgment. Okay, I mean, I really thought the earlier one looked like it was about timeliness. And so final could just mean we're done or something. I mean, it's France. So I don't understand how if something is about timeliness and then someone else says, now this is final, that means we say the timeliness thing was merits. No, so, Your Honor, it doesn't say the judgment was final. It says the final, the assessment made by the Court of Cassation on the absence of any fraud. It doesn't say that it was a final decision, period. But also, and Your Honor, I would respectfully push back against the interpretation of the Court of Cassation decision. If you look at pages 799 to 800, the listing of the report of Ms. Bailoval is a list of all materials considered by the court. It is not the holding. The holding is on page 800, which has two paragraphs that says all the grounds of cassation are unlikely to lead to cassation and then dismisses the appeal. Now, Mr. Philbin said, we have seven dueling expert declarations on the subject. Well, five of them are from his client. And the five declarations don't actually cite a single legal authority that endorses their view that whenever the court simply lists the report of effectively a bench memo, that means they are endorsing and adopting the bench memo. And you would think that if that was really what they meant, they would have said that in France when they got the Second Appeals Declaration. No, I mean, you're being incredibly helpful. But I'm going back to where you started when you started down the race to the cottage. Before that, on page 58, as you noted, there are a couple of paragraphs that address the management torts and that Sorry, what page, Your Honor? 58. That's where you directed us to look. That's right, yes. And there's a discussion that seems to be on the merits of the management torts. So how does that interact with the race to the cottage discussion in terms of what the district court held or what we should hold? You said earlier, as I understood it, that we don't even have to get to the preclusion questions because the management torts fail as a matter of not taking the cause of action for the reasons the district court said. Is that what you said? It is what I said, yes, Your Honor. So this whole other argument is in the alternative. Is that correct? Is that what you're saying? The two arguments. The preclusion argument. They're both in the alternative with one another. They're in the alternative. And if we agreed with the two very short paragraphs on page 58, we wouldn't get to the preclusion question. That's correct. Do I have that straight? That's correct. You would need to find as well, to be clear, to add up that argument that you would need to accept that the two theories of harm that Aldini was allowed to plead according to page 158. I think it's 58. Maybe it's 59, but I think it's 58. You would have to accept that those allegations are implausible and conclusory, as we argue they are in the supplemental brief. Or you could accept that they don't actually allege any specifics of any violation of duties of loyalty or any failure to secure financing as was legally required of them. And to be clear, you can read the complaint again. There's no mention of any refusal to take financing. This is also something that was litigated in the French court proceedings. So I pointed out the pages in the supplemental brief for this court's consideration. OK. So you're saying if we study more page 58, we're going to figure out there's a way to dismiss the management torts for failure to state a claim. If you study page 58 in part 1B2, I think, of the appellee brief where I address the management torts claim specifically. Another thing you think we could do is 4M9 convenes where we say they ran out the clock. Yes. And or because there was another French proceeding, they don't even need to have run out the clock. It's just done. Yes. And then you also have this very complicated issue preclusion. Respectfully, I think that if you just look at that one page that I pointed to in the second appeals judgment, it's not that complicated. But if you disagree with me, then yes, that's the third. And the fourth option is to say, which I mentioned in the beginning, that the California allegations have nothing to do with the French management torts claims whatsoever. These all involve that people flew to California and had this shady deal with Sivaco. Those allegations, while implausible, they don't involve board members violating their fiduciary duties. They involve a conspiracy that was perpetrated. No, wait, sorry. This one now is somehow there's no hook to the personal jurisdiction? Or I'm not sure what you're saying. Yes, that's right. I apologize, Your Honor. This final fourth way to get rid of management torts is there's no personal jurisdiction over them because there's no relevant jurisdictional context for management torts. But if there's any other claim, is it just supplemental jurisdiction to that? No, you have to have jurisdiction over every single claim for personal jurisdiction purposes. Does this get into the whether conspiracy jurisdiction is personal jurisdiction? No. No, Your Honor, it doesn't. No, no, no. I apologize if my argument hasn't been clear. Conspiracy jurisdiction turns on whether you can impute the contacts of one conspirator to another. But there's the separate issue about whether or not you have jurisdiction over every single claim that's alleged in the complaint. So for example, if I were to allege jurisdiction over a breach of contract claim over a contract that specifies a choice of law clause, that doesn't mean that I can just bring a RICO claim that has nothing to do with that contract whatsoever and say that it's supplemental or part of the conspiracy. You need to show that there is a connection between the forum contacts and every individual claim before you even get to the question of imputing jurisdictional context between defendants. As a matter of it being sort of properly supplemental. I mean, like we originally had a federal claim. We're a federal question, and we've got all these other claims that are supplemental jurisdiction to that. Are you saying there's not enough of a connection to bring this into the same case? Oh, no, sorry, Your Honor. So the supplemental jurisdiction is subject matter jurisdiction. There was subject matter jurisdiction was based on the supplemental jurisdiction statute for the state law claims. I'm talking about personal jurisdiction. And for personal jurisdiction, you need to have jurisdiction over every single claim that's brought in a complaint. Well, you need jurisdiction over the defendants, but you're saying the defendants for that claim. Is that what you're saying? Yes, that's right. Yes, the defendants for that claim. So because when it's specific jurisdiction, you need to be able to show a connection between the defendant, the claim, and the forum. And so you can't say because there's connections for a different claim in this case, there is also connections for, just because there's connections for the IEPA claim theoretically doesn't mean there's connections for the management torts claim. Can I come back? I'm sorry. I'll be commenting on this. And I think perhaps you'll be finishing your arguments soon. But I'm still. So I'm back on page 58. And the conclusion is that the court denies MBDA and swatic defendants' motion to dismiss the 10th class of action because there was an expert who testified that the items are not company damages. And he says there's no response. So he denies. So how does that help us in finding a way to dismiss them? So to be clear, Your Honor, to be clear. So what I was pointing to on 158 originally, the reason I first brought up that page, was in addressing the IEPA claim and explaining that his ruling about the bidding. But then you said it's also true of the management torts. But only as to that one point, whether he had an opportunity to require dolphin integration in its assets, but not as to anything else. Yes. And for the second point, that's the alternative ground for affirmance that I was mentioning to Judge Friedland, which is addressed in my appellee brief, where I say that he is correct that maybe those are two theories. They could plead in theory. But they didn't plead either of those theories of damages in their complaint. And they also didn't plead any actual management torts. I think we should end unless there are other questions.  Do you have more? It's a fine evening. OK. The only thing I'd add, Justice, Your Honor, is this case is overdetermined. We are happy to file any supplemental briefing that would be helpful in this court. I believe truly that all of the issues are fully reserved by the record and the pleadings before this court. We rest on our briefs. Thank you very much. Your Honor, I'd like to touch on just a few points. First, on the management torts, as I think Judge Berzon was getting to at the end there. On page 58 of the excerpts of record, what the district court actually did was not dismiss the management torts on a failure to state a claim theory. It said that they survive. But he could have been wrong. Or she. I don't remember. Anyway, the district court could be wrong. So why does it state a claim? For the reasons that are given by the district court, Your Honor, Aldini explained that it invested time and effort. It built up a strategic stake in the company for a reason. It got a 2% stake, which is about 10% of the free float of this company, because it was a very thinly traded company. And it was doing that, investing time and resources in order to figure out the value. Remember I mentioned they valued at 649 million euro. And then it got squeezed out with zero. I'm sorry. So you're saying that your losses. So the stake is because you bought some share of this company. You're saying some stock in this company. But then I thought your theory was your injury was from losing the auction, not getting to auction. Are you now saying your injury is the loss of the 2% of stock? Well, Your Honor, it's several forms of injury. And that's what the court points out here on page 58. There's the form of injury that there was stock. And that also goes to the IEPA claim, as we point out in our brief. That's an economic relationship with a view for a prospective advantage in the future, that ownership of stock. Because if there had been fair bidding for fair value, then even if Aldini got bid out, if the company was bought, Aldini would get something for its stock instead of getting squeezed out for zero. So that's a whole separate ground for the IEPA claim apart from winning the bidding. And I don't really understand squeezed out for zero because didn't they buy it for some value, just think it was too low? Aldini got zero. It got nothing for its shares. The assets were sold. The company wasn't bought. So this was an asset sale to NBD and Insulatech. So Aldini is a Swiss bank that specializes in finding targets for acquisition. It built up a strategic stake in this company after doing a lot of research and due diligence to figure out that this was an undervalued company, a target for it. It got its strategic stake. And then because, as is alleged, there was some effort to prevent the bankruptcy court from realizing that there were other interested bidders and to suppress bids from Silvaco, they got an asset sale for just 200,000 euro, which was about one one-hundredth of the value of the assets. So the injury is losing the potential to acquire. The injury is getting squeezed out for zero. The injury is having to spend all the time and resources to build up that strategic investment and do the research on that and get zero for the return on that. And that's what the district court properly pointed out at page 58, was sufficient to sustain the claim for the management torque. I understand the response of your opponents that the reputational issue and the share damages and, well, the reputational issue and the investment of time and effort issue was not alleged in the complaint as injuries. That's what it says. I haven't checked. Well, Your Honor, it is in the TRECO declaration that was put in. That's a declaration. That's not the complaint. And I can't point to a specific paragraph off the top of my head, but I do know that the complaint alleges that Aldini did research on the company and had evaluated it. I remember that, but I thought it was as to buying them in the auction. I don't remember this thing about the shares and losing to zero. Can you point to anything in the complaint that talks about that? Yes, Your Honor. Paragraph 39 of the complaint and paragraph 395 of the complaint both refer to Aldini having its equity stake destroyed, and that being the injury. And those are cited in our brief, in our reply brief, where we point out for the AIPA claim that there is this second theory of the type of relationship and prospective advantage. There are two theories. One is we have a relationship because we're a shareholder. We expect to benefit in the future from being a shareholder. You said 39, and what was the other one? I believe 395. If you would excuse me to pick up a... Yes, Your Honor. It's paragraph 39 at ER 230 and paragraph 395 at ER 340, and it refers to Aldini having its equity stake completely wiped out. So that is why page 58 of the excerpt of the record, the district court decision there, that doesn't support any ground for getting rid of the management torts. Second, in terms of forum nonconvenience on the management torts, Your Honor, this idea that Aldini was running out the clock was raised for the first time in the supplemental brief that the... Well, we asked them to, so it's not their fault. Well, no, but since they were simultaneous briefs, we have an opportunity to respond to that. In fact, we have a footnote in our supplemental brief that says it acknowledges that in some cases the fact that the statute of limitations has run is not going to be a problem, but that's only where it's alleged that there has been a strategic choice to run out the clock, and that's not alleged. But it sounds like they're saying... So are you saying you have a better response to Ronza? Well, Ronza, I think, is a separate issue from the way that running out the statute of limitations is. So running out of the statute of limitations, if the court's going to consider that, we would like an opportunity to have a couple of pages of supplemental brief to respond to that because that was only raised... And what would you say if we gave you that opportunity? Well, Your Honor, I believe that the situation, but I would like to check this with my client because it involves litigation from years before I was involved in this case, that there was a focus on litigation in France on unwinding the transaction. That's one type of litigation in France. And that there was not a shift to tort theories until after the information about Sivaco became available in November of 2020. And at that point, litigation had already been started in France and was still on appeal in the French Supreme Court, and the French Supreme Court didn't decide until May of 2021. And I think that is why then there was a shift to a different strategy, a different theory, but at that point, it was coming up on August for the statute of limitations to run. But I would like to verify that and be able to... But the complaint was filed here in August, so why couldn't it have been filed there in August? Because at that point, Your Honor, Sivaco was clearly central. And in order to get jurisdiction over Sivaco, they had to come to California. And why then at that point split it up into, if you're starting new litigation... Wasn't there a Sivaco France or a Sivaco U.S.? Well, Your Honor, Aldini has alleged that it was Sivaco that purchased the assets because Sivaco publicly announced that it purchased the assets. I mean, there's a press release with the dateline from California saying Sivaco purchased the assets. And as we point out in our reply brief, if necessary, we could, on remand, put in the SEC fine that Sivaco has made where Sivaco says they own the assets. Now, my opponent has pointed out that in France, we did refer to Sivaco France having purchased the assets. And how is that central to what happened a couple of years before Sivaco was involved? Well, the situation was this, Your Honor. There was this sale that Aldini believed was grossly for undervalue. Aldini knew about the bankruptcy sale. Aldini knew it was grossly for undervalue. And Aldini was trying to figure out a way in the French courts to unwind the sale. Aldini had no idea that Sivaco had, as Aldini now believes, been sort of brought into a scheme to suppress its bid, to keep it on the sidelines so that they could then later buy some of the assets. Because remember, there's an embargo on selling the assets for two years. By suppressing its bid if there was no auction. Pardon? How was Sivaco suppressing its bid if there was no auction? What's alleged in the complaint, Your Honor, is that Sivaco, who was present at the bankruptcy sale, and clearly had some interest in the assets since they later bought part of them, that what's alleged in the complaint is that there was an arrangement to get Sivaco to sit on the sidelines and not bid. Don't show interest. And this is another dispute. I believe that one of Mr. Trico's declarations describes that if there had been indications of sufficient interest, the French bankruptcy court would have had to have some sort of public auction. Can I bring you back to Ronza? What is your response to Ronza on Forum Nonconvenience? Your Honor, in the Ronza case, my response at this point is that the litigation that was going on in France was not litigation, as I understand it, where that management tort claim, that would have been a separate tort claim. You're trying to distinguish Ronza on the idea that Ronza had a discrimination claim and then a discrimination claim instead of here. You had some proceeding but not a management tort one. That's your distinction? Yes, Your Honor. That was a proceeding to unwind the transaction, and it's a different category of proceeding. That's my understanding, is that there was a focus on unwinding the transaction. There were no tort claims for damages in France. It was just a different type of animal altogether. I think we've taken you over your time, so unless there are other questions. Thank you very much, both sides, for the helpful arguments in this very complicated case. This case is submitted.
judges: BERZON, FRIEDLAND, Kennelly